# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF IOWA
# WESTERN DIVISION

HARKER'S DISTRIBUTION, INC.,

        Plaintiff,

vs.

REINHART FOODSERVICE, L.L.C.,

        Defendant.

No. C 08-4076-MWB

**MEMORANDUM OPINION AND ORDER REGARDING DEFENDANT'S MOTION TO COMPEL ARBITRATION AND TO STAY PROCEEDINGS**

_____

## TABLE OF CONTENTS

**I. INTRODUCTION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
   **A. Factual Background** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
   **B. Procedural Background** . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
   **C. Arguments Of The Parties** . . . . . . . . . . . . . . . . . . . . . . . . . . 9
      **1.**   **Reinhart's opening argument** . . . . . . . . . . . . . . . . . 9
      **2.**   **Harker's Distribution's response** . . . . . . . . . . . . . . . . 10
      **3.**   **Reinhart's reply** . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
      **4.**   **Harker's Distribution's surreply** . . . . . . . . . . . . . . . . 12

**II. LEGAL ANALYSIS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
   **A. Governing Law** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
   **B. Is Harker's Distribution Required To Arbitrate?** . . . . . . . . . . . . . . . 15
      **1.**   **Is the "accountant remedy" arbitration?** . . . . . . . . . . . . . 16
      **2.**   **What disputes are subject to arbitration?** . . . . . . . . . . . . . 21
      **3.**   **Should proceedings in this court be stayed?** . . . . . . . . . . . 24

**III. CONCLUSION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

I s the buyer of a wholesale food distribution business entitled to compel arbitration of the parties' dispute about the number of customers who were exclusively the seller's customers, on which the purchase price was in part based, pursuant to a clause in the parties' asset purchase agreement requiring submission of disputes about adjustments to the purchase price to a national accounting firm acceptable to both parties? Before pursuing the "accountant remedy" in the asset purchase agreement, the seller filed suit for declaratory judgment that the adjustments to the purchase price must be based on 1100 customers that the purchaser initially identified as "seller's only customers," not a mere 300 that the purchaser has now determined were "seller's only customers," after weeding out customers served by both parties, but identified by different names. The buyer contends that the "accountant remedy" in the parties' asset purchase agreement *is* "arbitration," which the parties must pursue before seeking any judicial determination of the present dispute, while the seller contends that, whatever the "accountant remedy" is, it is not "arbitration," and that it is inadequate to address the legal question of the effect of the buyer's unilateral mistake about the number of "seller's only customers."

## I. INTRODUCTION

### A. Factual Background

This matter comes before the court on a pre-answer motion to compel arbitration. Therefore, the following factual background is based on the allegations in the plaintiff's Complaint and Amended Complaint and, where necessary, such other facts, disputed and undisputed, pertinent to the present controversy as appear in the parties' briefing of the

defendant's Motion To Compel Arbitration. The present record does not, however, permit the court to make any findings to resolve factual disputes.

Plaintiff Harker's Distribution, Inc., alleges that it is now, and was at all times relevant, an Iowa corporation formed under the laws of Iowa with its principal place of business in LeMars, Plymouth County, Iowa, and that defendant Reinhart Foodservice, L.L.C., is now, and was at all times relevant, a Delaware limited liability company. Both parties were allegedly engaged in selling and distributing foods wholesale and providing other services in Iowa and other states, including Wisconsin and Illinois.

On June 7, 2007, the parties executed an Asset Purchase Agreement for Reinhart to acquire Harker's Distribution's wholesale food distribution customers in Wisconsin and Illinois. The Asset Purchase Agreement provides that it "shall be governed by and construed in accordance with the laws of the State of Illinois, excluding the 'Conflict of Laws' rules thereof." Asset Purchase Agreement (Complaint, Exhibit 1), § 10.7.

The Asset Purchase Agreement shows that the purchase price was based on a formula that included, *inter alia*, an "Earnout Ratio" dependent on sales obtained from "Harker's Only Customers" in the Wisconsin and Illinois territories in the one year following the execution of the Agreement. Somewhat more specifically, the Asset Purchase Agreement provides as follows:

> 2.1 <u>Purchase Price</u>. The purchase price (the "<u>Purchase Price</u>") for the Acquired Assets shall be determined in accordance with Section 2.2 and shall be equal to the Closing Date Payment plus the amount by which the Total Intangible Value exceeds the Closing Gross Margin Payment or minus the amount by which the Closing Gross Margin Payment exceeds the Total Intangible Value. . . .

Asset Purchase Agreement, § 2.1. "Total Intangible Value," in turn, was defined as "the product obtained by multiplying the Earnout Ratio and the Total Gross Margin." *Id.* at

§ 2.2(a)(vii).  The Asset Purchase Agreement defines "Earnout Ratio," "Harker's Only Customers," and "Selling Margin" as follows:

> (ii)    "Earnout Ratio" means the percentage obtained by dividing (A) the Selling Margin from Harker's Only Customers for the twelve (12) month period following the Closing Date by (B) the Selling Margin from Harker's Only Customers for the twelve (12) month period prior to, and ending on, April 30, 2007.

> (iii)   "Harker's Only Customers" means those customers of the Business to which Seller had sales activity during the twelve (12) full-month period prior to, and ending on, the Closing Date, and to which Purchaser had no sales activity during such period.  The Harker's Only Customers are identified on Schedule 2.2(a)(iii) hereto.

> * * *

> (vi)    "Selling Margin" means, with respect to the sale of any product, the proceeds received by the Seller above the Seller's Landed Cost for such product.

Asset Purchase Agreement, § 2.2(a)(ii), (iii), and (vi) (underlining in the original).

Harker's Distribution alleges that Reinhart prepared Schedule 2.2(a)(iii) in accordance with § 2.2(a)(iii) of the Asset Purchase Agreement, prior to execution of that Agreement, and that the Schedule identified some 1100 customers as "Harker's Only Customers."  Harker's Distribution alleges that, in contrast, at the time that the "Earnout Ratio" was to be finally determined one year from the date that the Asset Purchase Agreement was executed, Reinhart asserted that only 300 customers had been determined to be "Harker's Only Customers," which affects the "Earnout Ratio" and the "Purchase Price" and, hence, the amount that Harker's Distribution is entitled to under the terms of the Asset Purchase Agreement.  Indeed, Harker's contends that a determination of the

4

applicable number of "Harker's Only Customers" will likely determine whether Reinhart owes Harker's Distribution $2,994,623.00, or Harker's Distribution owes Reinhart $318,191.00.

Reinhart explains that, prior to execution of the Asset Purchase Agreement, Harker's Distribution provided Reinhart with a list of its customers to allow for the determination of the "Harker's Only Customers," which Reinhart compared to its customer list to prepare Schedule 2.2(a)(iii). Reinhart explains, further, that, unbeknownst to Reinhart at the time, Harker's Distribution and Reinhart had used different names for some of the same customers. For example, Reinhart contends that Harker's Distribution used the name "Fox River Retirement Center" for a customer that Reinhart identified as "McHenry Villa"; that Harker's Distribution used the name "Adams County Memorial Hospital" for a customer that Reinhart identified as "Moundview Memorial Hospital & Clinic"; and that Harker's Distribution used the name "Little Babes" for a customer that Reinhart identified as "Zenelli's." Reinhart contends that it only became aware of the problem with different identifications of the same customers when it began to service what were supposed to be "Harker's Only Customers," because the asset purchase transaction was put together extremely quickly at Harker's Distribution's request. The present record provides no insight into the precise contents of the "list of customers" that Harker's Distribution provided to Reinhart, such as whether the list identified the precise addresses or contact persons for the customers, and, consequently, no insight into whether the list of customers would have permitted Reinhart, with reasonable diligence, to determine whether customers identified by the parties by different names were, nevertheless, the same entities.

The Asset Purchase Agreement provided for the final determination of the purchase price and resolution of disputes about the purchase price as follows:

(b)     On or before the date that is thirteen (13) months following the Closing Date, the Purchaser shall prepare a report (the "Preliminary Report") showing the Purchaser's calculation of the Total Intangible Value (the "Preliminary Total Intangible Value").  Promptly following receipt of the Preliminary Report, the Seller may review the same and, within thirty (30) days after the date of such receipt (the "Notice Period"), may deliver to the Purchaser a certificate setting forth its objections to the Preliminary Total Intangible Value as set forth in the Preliminary Report, together with a summary of the reasons therefore and calculations that, in its view, are necessary to eliminate such objections.  In the event the Seller does not so object within the Notice Period, the Preliminary Total Intangible Value set forth on the Preliminary Report shall be final and binding as the "Actual Total Intangible Value" for purposes of this Agreement.

(c)     In the event the Seller so objects within the Notice Period, the Purchaser and the Seller shall use their reasonable efforts to resolve by written agreement (the "Agreed Adjustments") any differences as to the Preliminary Total Intangible Value and, in the event the Purchaser and the Seller so resolve any such differences, the Preliminary Total Intangible Value set forth in the Preliminary Report as adjusted by the Agreed Adjustments shall be final and binding as the Actual Total Intangible Value for purposes of this Agreement.

(d)     If any objections raised by the Seller are not resolved by Agreed Adjustments within the thirty-day period next following the receipt by the Purchaser of the Seller's objections, then the Purchaser and the Seller shall submit the objections that are then unresolved to a national accounting firm acceptable to both the Purchaser and the Seller and such firm (the "Accounting Firm") shall be directed by the Purchaser and the Seller to resolve the unresolved objections as promptly as reasonably practicable and to deliver written notice to each of the Purchaser and the Seller setting forth its resolution of the disputed matters.  The Preliminary Total Intangible Value, after giving effect to any Agreed

Adjustments and to the resolution of disputed matters by the Accounting Firm, shall be final and binding as the Actual Total Intangible Value for purposes of this Agreement but shall not limit the representations, warranties, covenants and agreements of the parties set forth elsewhere in this Agreement.

(e)  The parties shall make available to the Purchaser, the Seller and, if applicable, the Accounting Firm, such books, records and other information (including work papers) as any of the foregoing may reasonably request to prepare or review the Preliminary Report or any matters submitted to the Accounting Firm.  The fees and expenses of the Accounting Firm hereunder shall be paid 50% by the Purchaser and 50% by the Seller.

Asset Purchase Agreement, § 2.2(b)-(e).

Reinhart asserts, and Harker's Distribution does not appear to dispute, that when the parties' disagreement about "Harker's Only Customers" became apparent, the parties worked toward a resolution.  However, before the end of the thirty days that the parties were required to use reasonable efforts to resolve the matter, and before submitting the dispute to an accounting firm for resolution, Harker's Distribution filed the present action for declaratory judgment.

### B.  Procedural Background

Harker's Distribution filed the present action on September 5, 2008, asserting diversity jurisdiction and sufficient amount in controversy pursuant to 28 U.S.C. § 1332(a).  Harker's Distribution's original Complaint sought declaratory judgment pursuant to 28 U.S.C. § 2201 "declaring the rights of the parties, and specifically finding that Plaintiff is entitled to an earn out ratio in calculating the purchase price based on the 1100 customers who were designated by Defendant and agreed upon by Plaintiff and

Defendant as 'Harker's Only Customers,' that a money judgment be entered in favor of Plaintiff and against Defendant for $2,994,623.00, with interest and costs and that the court provide other relief deemed appropriate." Complaint (docket no. 1), Prayer.

Before answering Harker's Distribution's original Complaint, Reinhart filed its Motion To Compel Arbitration And To Stay Proceedings (docket no. 13) on October 28, 2008. In its Motion, Reinhart asserted, *inter alia*, that § 2.2(d) of the Asset Purchase Agreement requires arbitration of the parties' dispute, but that Harker's Distribution refuses to submit the differences that were not resolved to arbitration. Therefore, Reinhart requests that the court order the parties to proceed to arbitration pursuant to Chapter 710 of the Illinois Compiled Statutes (ILCS) 5/2(a), and stay this proceeding pending the completion of the arbitration proceedings as provided in 710 ILCS 5/2(d). Harker's Distribution filed a Resistance (docket no. 14) to Reinhart's Motion on November 11, 2008; Reinhart filed a Reply (docket no. 17) on December 2, 2008; and Harker's Distribution filed a Surreply (docket no. 20) by agreement of the parties and leave of court on December 5, 2008. No party requested oral arguments in the manner required by N.D. IA. L.R. 7.c., so this matter is fully submitted on the written submissions.

On December 16, 2008, after Reinhart's Motion was fully briefed, Harker's Distribution filed an Amended Complaint (docket no. 21). The Amended Complaint does not appear to change significantly the factual basis for the claimed relief, and prays for only slightly different relief, specifically, "that the Court enter an order declaring the rights of the parties, and specifically finding that the earnout ratio Plaintiff is entitled to in calculating the purchase price is based on 1100 customers who were designated by Defendant as 'Harker's Only Customers' and that Plaintiff is entitled to the purchase price set forth in the Asset Purchase Agreement based on 1100 customers." Amended Complaint, Prayer. Thus, the Amended Complaint rewords the relief sought somewhat

8

and drops the specific allegation concerning the amount of the money judgment sought by Harker's Distribution.

## C.  Arguments Of The Parties

### 1.  Reinhart's opening argument

In support of its Motion To Compel Arbitration And To Stay Proceedings, Reinhart contends that, pursuant to § 10.7 of the Asset Purchase Agreement, Illinois law governs the present dispute about arbitrability.  Although Reinhart acknowledges that the Federal Arbitration Act, 9 U.S.C. § 1, *et seq.*, may preempt the Illinois Uniform Arbitration Act when a contract containing an arbitration provision involves interstate commerce, where the contract provides that it will be governed by state law and nothing in the contract suggests that the parties did not intend the choice-of-law provision to apply to the parties' arbitration provisions, the Illinois Uniform Arbitration Act still controls.  Reinhart contends, further, that the Illinois Uniform Arbitration Act embodies a legislative policy favoring enforcement of agreements to arbitrate future disputes and that courts regard arbitration agreements with favor to achieve an easier, more expeditious, and less expensive resolution of disputes.

Here, Reinhart contends that the Asset Purchase Agreement contains a valid and enforceable agreement to arbitrate, because it provides for submission of the parties' dispute to an impartial third party for a final and binding decision.  Notwithstanding the parties' agreement, however, Reinhart contends that Harker's Distribution did not wait the required thirty days for the parties to attempt an agreed resolution and, instead, filed suit before the matter was submitted to the required arbitration.  Reinhart contends that, at this juncture, the court should concern itself solely with whether an agreement exists to arbitrate the dispute in question and, because such an agreement does exist, the court

should decide the arbitrability question, compel arbitration, and stay this proceeding pending the completion of the arbitration proceedings.

### 2. *Harker's Distribution's response*

In response, Harker's Distribution agrees that the Illinois Uniform Arbitration Act applies to this case pursuant to the choice-of-law provision in the Asset Purchase Agreement. Harker's Distribution also admits that, in essence, § 2.2(d) of the Asset Purchase Agreement provides that a mutually acceptable accounting firm shall resolve the objections to the calculation of the final purchase price and deliver a written resolution to the parties, but Harker's Distribution nevertheless denies that this provision is an agreement to arbitrate. Because Harker's Distribution denies the existence of an agreement to arbitrate, Harker's Distribution also agrees that the court must decide, as a matter of law, the question of whether the specific matter at issue falls within an arbitration agreement.

Harker's Distribution contends that § 2.2(d) does not contain clear language that the parties agreed to arbitrate—indeed, it does not even use the word "arbitrate." Harker's Distribution points out, further, that the agreement fails to cite or incorporate any formalized arbitration rules, such as the American Arbitration Association Rules, the Federal Arbitration Act, or the Illinois Uniform Arbitration Act, and the failure to do so, in Harker's Distribution's view, puts the "accountant remedy" on "shaky ground" as arbitration. Harker's Distribution also contends that the "accountant remedy" provision here does not contain all of the common incidents of arbitration, consisting of an independent adjudicator, substantive standards, and an opportunity for each side to present its case. Specifically, Harker's Distribution argues that § 2.2(d) does not indicate that the parties are entitled to an opportunity to present their cases, and it certainly does not provide for a hearing, let alone any opportunity to present evidence, cross-examine

witnesses, or request evidence to support their cases, as §§ 5 and 7 of the Illinois Uniform Arbitration Act permit. Harker's Distribution also contends that the "accountant remedy" does not provide any meaningful substantive standards for resolution of the primary issue, which is the legal consequences flowing from a unilateral mistake made by Reinhart as to the contents of the customer list. Harker's Distribution points out that an accountant would not be trained in the law to address such an issue, nor does the Asset Purchase Agreement require an accountant to apply such law to resolve the dispute. Harker's Distribution also argues that it is doubtful that the "written resolution" that the accountant is to provide would constitute an "award" that could be confirmed by the court, as required by §§ 8 and 11 of the Illinois Uniform Arbitration Act. Harker's Distribution contends that, without the ability to enforce a "written resolution" by a money judgment, the "accountant remedy" could "merely result in a piece of paper without effect." Finally, although the agreement provides that the "written resolution" is "final and binding," it does not indicate whether any appeal is permitted and, even if an appeal is available, there are not sufficient safeguards for the legal issue of unilateral mistake to be properly addressed by appeal. For these reasons, Harker's Distribution contends that Reinhart's Motion To Compel Arbitration should be denied.

### 3. *Reinhart's reply*

In reply, Reinhart contends that Harker's Distribution's argument makes § 2.2(d) of the Asset Purchase Agreement a "nullity" and "superfluous," but the terms of an agreement must, if possible, be construed to mean something. Reinhart contends that the inclusion of the "accountant remedy" provision demonstrates the parties' intent to submit this dispute to an accounting firm for a final and binding decision. Reinhart also contends that, if an accountant is not equipped to resolve this dispute, then Harker's Distribution should not have agreed to the provision requiring recourse to the accountant to decide the

dispute. Indeed, Reinhart contends that it is common practice for accounting firms to arbitrate disputes involving financial aspects of mergers and acquisitions. Reinhart also contends that the absence of the words "arbitration" or "arbitrate" from § 2.2(d) is of no moment, because the question is the effect of the clause, not the terms used. Here, Reinhart contends that the provision in question does bear the common incidents of arbitration, such that it is arbitration in all but name: The parties agreed to submit accounting disputes about the final purchase price to an independent adjudicator, the accounting firm, for a final and binding determination, and there is no logical reason why the accountant's determination would not be an "award"; the agreement sets forth a substantive definition of "Harker's Only Customers"; and the parties are allowed to submit their calculations and objections to the accountant.

### 4.   *Harker's Distribution's surreply*

In its surreply, Harker's Distribution disputes Reinhart's contention that the parties' dispute is merely an issue of accounting. Instead, Harker's Distribution contends that the declaratory judgment that it seeks is the effect of an alleged unilateral mistake by Reinhart and, specifically, whether that unilateral mistake is sufficient justification to alter the terms of the parties' agreement about "Harker's Only Customers." Harker's Distribution contends that the court is best equipped to address that legal issue, not an accountant who has no standards or guidelines under which to make such a legal determination.

## II.  LEGAL ANALYSIS

### A.  Governing Law

In *Fit Tech, Inc. v. Bally Total Fitness Holding Corp.*, 374 F.3d 1 (1st Cir. 2004), a case cited by both parties here for various propositions, the First Circuit Court of Appeals held that, notwithstanding that an asset purchase agreement containing an

"accountant remedy" not unlike the one at issue here provided that Illinois law governed the contract, the question of whether the accountant remedy was arbitration at all was governed by *federal* law:

> That a uniform federal definition is required is obvious to us. True, the substance of the purchase agreement—who promised to do what—is governed by state law (here, the parties agree, by Illinois law), but whether what has been agreed to amounts to "arbitration" under the Federal Arbitration Act depends on what Congress meant by the term in the federal statute. Assuredly Congress intended a "national" definition for a national policy. Analogous cases are numerous.

*Fit Tech, Inc.*, 374 F.3d at 6.

Here, however, the parties agree that Illinois law applies, even to the question of the meaning of the term "arbitration," both citing *Glazer's Distributors of Illinois, Inc. v. NWS-Illinois, L.L.C.*, 876 N.E.2d 203, 212 (Ill. App. Ct. 2007). In *Glazer's Distributors*, the Illinois Court of Appeals reasoned as follows:

> In circumstances where parties to a contract have agreed to arbitrate in accordance with state law, the [Federal Arbitration Act (FAA)] does not apply, even where interstate commerce is involved. *Yates v. Doctor's Associates, Inc.,* 193 Ill. App. 3d 431, 438, 140 Ill. Dec. 359, 549 N.E.2d 1010 (1990), citing *Volt Information Sciences, Inc. v. Board of Trustees of Leland Stanford Junior University,* 489 U.S. 468, 109 S. Ct. 1248, 103 L. Ed. 2d 488 (1989). Notably, the United States Supreme Court in *Volt* concluded that application of a state arbitration law was not preempted by the FAA where the contracting parties had agreed that the contract at issue, including the arbitration provision, would be governed by state law. *Volt,* 489 U.S. at 470-71, 109 S. Ct. at 1251, 103 L. Ed. 2d at 494-95.

Most significantly, in *Yates,* as in this case, the parties included a choice-of-law provision selecting state law as the governing law of the contracts, and there was nothing in the record to suggest that the parties did not intend for the choice-of-law provision to apply to the arbitration provision. *Yates,* 193 Ill. App. 3d at 438, 140 Ill. Dec. 359, 549 N.E.2d 1010. Consequently, in accordance with *Volt* and *Yates,* we find that the Act, rather than the FAA, applies to this case because the parties explicitly included a choice-of-law provision selecting Illinois law as the governing law for both the MSA and CSA, and there is nothing in those contracts to support a conclusion that Illinois law was inapplicable to the arbitration provision. See also *Bishop v. We Care Hair Development Corp.,* 316 Ill. App. 3d 1182, 1190, 250 Ill. Dec. 394, 738 N.E.2d 610 (2000) (discussing *Yates* and *Volt* and concluding that the choice of law clause at issue reflected an agreement to arbitrate in accordance with Illinois law).

Glazer's citation to *Mastrobuono v. Shearson Lehman Hutton, Inc.,* 514 U.S. 52, 55, 115 S. Ct. 1212, 1215, 131 L. Ed. 2d 76, 82-83 (1995), does not alter our decision. As explained by this court in *Bishop,* the *Mastrobuono* court analyzed a contract that ambiguously provided in its arbitration clause that claims for punitive damages would be arbitrated, but contradicted itself in its choice-of-law provision by selecting New York law, under which punitive damages were prohibited in arbitration. *Bishop,* 316 Ill. App. 3d at 1190, 250 Ill. Dec. 394, 738 N.E.2d 610 (discussing *Mastrobuono*). Ultimately, the *Mastrobuono* court construed the ambiguity against the drafting party, relied on the FAA presumption that all doubts regarding the scope of arbitration be resolved in favor of arbitration, and concluded that the choice-of-law provision covered the rights and duties of parties, while the arbitration clause covered arbitration. *Bishop,* 316 Ill. App. 3d at 1191, 250 Ill. Dec. 394, 738 N.E.2d 610, citing *Mastrobuono,* 514 U.S. at 64, 115 S. Ct. at 1219, 131 L. Ed. 2d at 88.

> Here, unlike *Mastrobuono,* there is no such ambiguity that would require us to similarly construe the arbitration and choice-of-law provisions contained in the MSA and CSA. More significantly, in *Mastrobuono,* the United States Supreme Court relied on the FAA presumption liberally favoring arbitration after recognizing that it was possible to interpret the contract's choice-of-law provision in a manner that directly conflicted with the arbitration provision regarding punitive damages, which was an interpretation that the Court found "untenable." *Mastrobuono,* 514 U.S. at 63-64, 115 S. Ct. at 1219, 131 L. Ed. 2d at 88. In this case, we have no such reason to rely upon the FAA presumption, especially where we have found that the FAA is inapplicable.

*Glazer's Distributors*, 876 N.E.2d at 212-13.

Here, where the parties agree that Illinois law applies to all aspects of the Asset Purchase Agreement, pursuant to the choice-of-law provision, not merely to the "substance" of that Agreement, *see Fit Tech*, 374 F.3d at 6, and there is nothing ambiguous about the application of Illinois law to the arbitration provision itself, *see Glazer's Distributors*, 876 N.E.2d at 212-13, the court will follow the parties' lead, and apply Illinois law, not federal law.

### B. Is Harker's Distribution Required To Arbitrate?

The Illinois Court of Appeals has explained that, "'[w]hether under federal rules or state law, there is no arbitration without a valid contract to arbitrate.'" *Tortoriello v. Gerald Nissan of North Aurora, Inc.*, 882 N.E.2d 157, 169 (Ill. App. Ct. 2008) (quoting *Aste v. Metropolitan Life Insurance Co.*, 728 N.E.2d 629 (2000)). "In determining whether a valid arbitration agreement arose between the parties, [the court] should look to the state law that ordinarily governs the formation of contracts.'" *Id.* (quoting *Aste*,

728 N.E.2d 629, in turn quoting *Gibson v. Neighborhood Health Clinics, Inc.*, 121 F.3d 1126, 1130 (7th Cir. 1997)).  More specifically,

> "At a hearing on a motion to compel arbitration, the only issue before the court is whether an agreement exists to arbitrate the dispute in question." *Travis [v. American Mfrs. Mut. Ins. Co.],* 335 Ill. App. 3d [1171,] 1175, 270 Ill. Dec. 128, 782 N.E.2d 322 [(2002)].  "If the language of an arbitration agreement is clear and it is obvious that the dispute desired to be arbitrated falls within the scope of the arbitration clause, the court should compel arbitration." *Travis,* 335 Ill. App. 3d at 1175-76, 270 Ill. Dec. 128, 782 N.E.2d 322.  "Likewise, if it is obvious that the issue sought to be arbitrated is not within the scope of the arbitration clause, the court should decide the arbitrability issue in favor of the opposing party, because no agreement to arbitrate the dispute exists." *Travis,* 335 Ill. App. 3d at 1175, 270 Ill. Dec. 128, 782 N.E.2d 322.  "The parties are bound to submit to arbitration only those issues that they have agreed clearly to resolve through the arbitration mechanism, and a court should not extend an agreement by construction or implication." *Travis,* 335 Ill. App. 3d at 1175, 270 Ill. Dec. 128, 782 N.E.2d 322.

*Griffith v. Wilmette Harbor Ass'n, Inc.*, 881 N.E.2d 512, 519-20 (Ill. App. Ct. 2007).  Thus, the court must decide whether there was an agreement to arbitrate, and if so, then determine whether the issue sought to be arbitrated falls within the scope of that agreement to arbitrate.  The first question necessarily involves whether the "accountant remedy" is "arbitration."

## 1.    Is the "accountant remedy" arbitration?

As to the first question before the court, *id.*, both parties have relied on *Fit Tech* as authority that the "accountant remedy" provision at issue here either is or is not an agreement to arbitrate.  The court agrees that *Fit Tech* is instructive, because it also

involved the question of whether an "accountant remedy" provision was an "arbitration" provision. *See Fit Tech*, 374 F.3d at 6.

The "accountant remedy" provision at issue in *Fit Tech* provided as follows:

> (f) *Resolution of the Sellers' Protest*. If the Buyer and the Sellers are unable to resolve any disagreement with respect to the Advance Earn-Out Schedule or the Earn-Out Schedule within twenty (20) days following the Buyer's receipt of any Protest Notice, then the items in dispute will be referred to the Accountants for final determination within forty-five (45) days, which determination shall be final and binding on all of the parties hereto. The Accountants shall be engaged by the Sellers and the Buyer regarding the Advance Earn-Out Schedule or the Earn-Out Schedule, as applicable, based upon the written submissions of the Sellers and the Buyer, and the Accountants may, but shall not be required to, audit the Advance Earn-Out Schedule or the Earn-Out Schedule or any portion thereof. The Advance Earn-Out Schedule and the Earn-Out Schedule as ultimately prepared and finalized in accordance with this Section 3.5(f) shall thereafter be deemed to be and constitute the "Advance Earn-Out Schedule" and the "Earn-Out Schedule" respectively, for all purposes.

*Fit Tech*, 374 F.3d at 3.

Applying *federal* law, the court in *Fit Tech* reasoned that whether or not the "accountant remedy" was "arbitration" "does not depend on nomenclature used in the agreement," but on "how closely the specified procedure resembles classic arbitration and whether treating the procedure as arbitration serves the intuited purposes of [the legislature]." *Id.* at 7. The court reasoned, further, that "the common incidents of arbitration of a contractual dispute" were whether the remedy was "final"; whether it involved an "independent adjudicator"; "whether there were "substantive standards"; and whether there was "an opportunity for each side to present its case." *Id.* The court found

all such incidents present, because the accountant remedy provided that it was "final," even if it was doubtful that the remedy was "any more final than ordinary arbitration," but that the court concluded that it need not decide that issue; the account was the "independent adjudicator"; the "substantive standards" were present in the contractual terms of the pay-out; and there was "an opportunity for each side to present its case," apparently based on the language of the "accountant remedy" providing for "written submissions of the Sellers and the Buyer." *Id.* The court noted one departure from the common features of many arbitrations in that case, at least as found by the district court, was the reference to the accountant of only the "accounting" issues, not the "operational disputes" that affected the pay-out, but the court noted that "arbitrations sometimes do cover only a part of the overall dispute between the parties." *Id.*

Considering the same "incidents of arbitration," the parties here advocate different results: Reinhart argues that all such "incidents" are present, but Harker's Distribution points particularly to the lack of "substantive standards" and the lack of "an opportunity for each side to present its case." The court finds that Reinhart's reading of the "accountant remedy" provision is the correct one. Indeed, the court rejects out of hand Harker's Distribution's contention that the "accountant remedy" is *not* "arbitration," because it never uses the word "arbitrate," and does not incorporate any arbitration body's or arbitration act's rules of arbitration. As the court in *Fit Tech* observed, whether or not the "accountant remedy" is "arbitration" "does not depend on nomenclature used in the agreement," but on "how closely the specified procedure resembles classic arbitration and whether treating the procedure as arbitration serves the intuited purposes of [the legislature]." *Id.* at 7. Moreover, Harker's Distribution cited no authority whatsoever suggesting that a valid arbitration provision must incorporate some arbitration body's or arbitration act's rules of arbitration, and the contention is nonsensical on its face.

As to the pertinent "incidents of arbitration," first, there is no dispute that "a national accounting firm acceptable to both the Purchaser and the Seller," as provided in § 2.2(d), is an "independent adjudicator." *Id.* at 7 (an incident of arbitration is an "independent adjudicator"). Second, as in *Fit Tech*, § 2.2(d) expressly provides that the accountant remedy "shall be final and binding as the Actual Total Intangible Value for purposes of this Agreement," so that it involves the requisite "finality." *Cf. Fit Tech*, 374 F.3d at 7 (noting that the purchase agreement made the "accountant remedy" "final," even if it was doubtful that the remedy was "any more final than ordinary arbitration," but that the court need not decide that issue). Indeed, Harker's Distribution's assertion that the "accountant remedy" here is not "arbitration" because it does not provide for "appeal" is contrary to the notion that an incident of arbitration is its "finality." Similarly, the court finds Harker's Distribution's argument that the accountant's determination might not be an "award" enforceable by the courts to be unsupported by any authority or convincing reasoning.

Contrary to Harker's Distribution's contentions, the Asset Purchase Agreement also provides "substantive standards" for resolution of the dispute, a contractual provision expressly defining "Harker's Only Customers" as "customers of the Business to which Seller had sales activity during the twelve (12) full-month period prior to, and ending on, the Closing Date, and to which Purchaser had no sales activity during such period." Asset Purchase Agreement, § 2.2(a)(iii); *cf. Fit Tech*, 374 F.3d at 7 (the "substantive standards" were the contractual terms of the pay-out). There is no question that an accounting firm is fully equipped to apply this definition to each of the now-disputed customers on Schedule 2.2(a)(iii). The court will leave aside, for now, questions about what issues are "arbitrable."

Finally, Contrary to Harker's Distribution's contentions, the "accountant remedy" *does* provide "an opportunity for each side to present its case." *See id.* at 7 (the final incident of arbitration is "an opportunity for each side to present its case"). In *Fit Tech*, the court found that this "incident of arbitration" was present, even though the "accountant remedy" at issue in that case provided only that the accountant would make its decision "based upon the written submissions of the Sellers and the Buyer." *Id.* Nevertheless, Harker's Distribution argues that the "accountant remedy" here does not provide "an opportunity for each side to present its case," because the provision does not provide for a hearing, let alone any opportunity to present evidence, cross-examine witnesses, or request evidence to support the parties' cases. Contrary to Harker's Distribution's contentions, the Illinois Uniform Arbitration Act does not require such extensive procedures, either. Section 5 of that Act provides that "[t]he parties are entitled to be heard, to present evidence material to the controversy and to cross-examine witnesses appearing at the hearing" *only* if the arbitration agreement does not otherwise provide. *See* 710 ILCS 5/5 ("Unless otherwise provided by the agreement," certain hearing requirements are established by the statute). Here, the "accountant remedy" provisions expressly provide "otherwise," by requiring only that "the Purchaser and the Seller shall submit the objections that are then unresolved to a national accounting firm acceptable to both the Purchaser and the Seller," *see* Asset Purchase Agreement, § 2.2(d), and that "[t]he parties shall make available to the Purchaser, the Seller and, if applicable, the Accounting Firm, such books, records and other information (including work papers) as any of the foregoing may reasonably request to prepare or review the Preliminary Report or any matters submitted to the Accounting Firm." *See id.*, § 2.2(e). These provisions provide at least as extensive an opportunity for the parties to present their respective cases to the accountant as a provision providing merely for the accountant to decide the matter

on "written submissions" by the parties. *Fit Tech*, 374 F.3d at 7 (finding the "opportunity to be heard" incident of arbitration was satisfied by a provision that provided for "written submissions" by the parties).

The court concludes that the "accountant remedy" in the parties' Asset Purchase Agreement is "arbitration."

### 2.    *What disputes are subject to arbitration?*

Having found that the "accountant remedy" provision is "arbitration," the question becomes what disputes the parties have agreed to arbitrate. *Griffith*, 881 N.E.2d at 519-20; *see also Fit Tech*, 374 F.3d at 8 (having found that an "accountant remedy" was "arbitration," the court turned to what issues were arbitrable). The court's resolution of this issue is quite different from the parties', both of whom have assumed that what is submitted to the accountant is "all or nothing."

In *Fit Tech*, the court found that, while the "accountant remedy" was "arbitration," the only issues subject to arbitration were "accounting" issues, not "operational" issues, even though "operational" issues might affect the "pay-out" under the contract. *Fit Tech*, 374 F.3d at 8. The court explained that such a resolution was consistent with the intent of the parties:

> Absent admissible extrinsic evidence bearing upon intent, a court in interpreting disputed contract language asks what reasonable persons in the position of the parties would ordinarily have intended by using the words in question in the circumstances. 2 *Farnsworth on Contracts* §§ 7.9, 7.10 (3d ed.2004), a view followed in Illinois; *Horbach v. Kaczmarek,* 988 F. Supp. 1126, 1129 (N.D.Ill.1997); *Tatar* v. *Maxon Constr. Co.,* 54 Ill.2d 64, 294 N.E.2d 272 (1973). By this test, referring the operational issues to the accountants makes no sense.

The phrase "any disagreement" refers to earning schedules whose components are defined in detail in the purchase agreement in accounting terms: specifically, the EBITDA formula for earnings of the eight centers before certain other costs (*e.g.,* interest, taxes, depreciation) are taken into account. And, the unresolved disagreements are to be referred to "accountants." In context, it therefore makes most sense to read "any disagreements" as referring to disagreements about *accounting* issues arising in the calculations that underpin the schedules.

Conversely, it makes no sense to assume that accountants would be entrusted with evaluating disputes about the operation of the business in question. Yes, operational misconduct may well affect the level of earnings and therefore the schedules, but the misconduct itself would not be a breach of proper accounting standards. Nor would one expect accountants to have special competence in deciding whether business misconduct unrelated to accounting conventions was a breach of contract or any implied duty of fair dealing.

Thus, the accounting treatment of new membership sales was correctly regarded by the district court as an issue properly reserved for Price Waterhouse; but whether Bally had manipulated the phone system to divert calls from the eight centers to other Bally centers involves not an accounting question but contract interpretation and judgments about reasonable business practices. Whether specific issues fall on one side or the other of the dividing line could be disputed; but on this appeal Bally has attacked only the district court's general bifurcation approach and not its classification of particular misconduct claims.

*Fit Tech*, 374 F.3d at 8-9 (emphasis in the original). The court noted that there were at least four different cases in which clauses directing certain disputes to accountants were read as implicitly limited to accounting issues. *Id.* at 9 (citing *Blutt v. Integrated Health Servs., Inc.,* No. 96 CIV. 3612 LLS., 1996 WL 389292 (S.D.N.Y. July 11, 1996);

*Powderly v. MetraByte Corp.,* 866 F. Supp. 39 (D. Mass. 1994); *United Steelworkers of Am. v. Nat'l Roll Co.,* No. 89-1491, 1990 WL 10043689 (W.D. Pa. May 3, 1990); *Parker v. Twentieth Century-Fox Film Corp.,* 118 Cal. App.3d 895, 173 Cal. Rptr. 639 (1981)). Therefore, the court found that the "accountant remedy" required submission to the accountant of only "accounting" issues, but not other "operational" issues.

Similarly, here, the parties agreed to submit to the accountant arbitrator "objections that are then unresolved," *see* Asset Purchase Agreement, § 2.2(d), that is, the seller's unresolved objections to "the Purchaser's calculation of the Total Intangible Value (the 'Preliminary Total Intangible Value')." *See id.*, § 2.2(b) & (c). Thus, it makes sense to read the agreement to entrust to the accountant any *accounting matters* involved in determining "Total Intangible Value." *See Fit Tech*, 374 F.3d at 8-9 (under Illinois law, "interpreting disputed contract language asks what reasonable persons in the position of the parties would ordinarily have intended by using the words in question in the circumstances"). Specifically, it makes sense to assume that the accountant was entrusted to determine which customers were "Harker's Only Customers," as part of a determination of "Total Intangible Value," where the contract expressly defined "Harker's Only Customers" on the basis of accounting information about whether Harker's Distribution had served the customer during the pertinent twelve-month period and Reinhart had not. *See id.*, § 2.2(a)(iii). It seems plain to the court that reasonable persons would have realized that one of the issues that would be potentially in dispute in the determination of "Total Intangible Value" would be precisely which customers were "Harker's Only Customers," pursuant to the contractual definition, notwithstanding inclusion of a list of purported "Harker's Only Customers" in Schedule 2.2(a)(iii)—indeed, there would be little point in including both a contractual definition of "Harker's Only Customers" and

23

Schedule 2.2(a)(iii), if the Schedule alone were the final determination of which customers were "Harker's Only Customers."

On the other hand, it makes no sense to assume that the parties also agreed to submit to the accountant determination of the legal question of the effect of Schedule 2.2(a)(iii), or the inclusion on that Schedule of customers that did not fit the contractual definition of "Harker's Only Customers," or whether there had been a mutual or unilateral mistake as to whether certain customers met the contractual definition of "Harker's Only Customers," let alone the question of what effect, if any, such a mutual or unilateral mistake might have on enforceability or rescission of the Asset Purchase Agreement. *Fit Tech*, 374 F.3d at 8-9 (similarly distinguishing between a reasonable intent to submit to the accountant accounting matters and a nonsensical assumption that the parties agreed to submit other issues to the accountant). Consequently, the "accountant remedy" requires arbitration of only the "accounting issues" involved in determining the "Total Intangible Value." As in *Fit Tech*, this court concludes that this "bifurcation" of issues "rests on a realistic parsing of the purchase agreement." *Id.* at 8.

### 3.    *Should proceedings in this court be stayed?*

Because the court concludes that only some of the issues raised by the parties must be arbitrated pursuant to the "accountant remedy," the question becomes whether proceedings in this court should be stayed on the issues that properly belong to the court. Because the parties did not recognize, or at least did not argue, that the "accountant remedy" might require arbitration of only some of the issues in the case, they did not address whether a stay in this case, based on a finding that the "accountant remedy" is arbitration, should be anything other than "all or nothing." The court, however, must consider that question.

The Illinois Uniform Arbitration Act provides, in pertinent part, as follows:

> (d) Any action or proceeding involving *an issue* subject to arbitration shall be stayed if an order for arbitration or an application therefor has been made under this Section *or, if the issue is severable,* the stay may be with respect thereto only. When the application is made in such action or proceeding, the order for arbitration shall include such stay.

710 ILCS 5/2(d) (emphasis added). Thus, the court must stay proceedings if *an issue* is subject to arbitration, unless the issue is severable from non-arbitrable issues. *See Casablanca Trax, Inc. v. Trax Records, Inc.*, 889 N.E.2d 1219, 1224 (Ill. App. Ct. 2008) ("This section leaves the court two options when a case includes one issue subject to arbitration and a separate issue not subject to arbitration. The court may 'stay the entire proceeding pending arbitration, or, if the issue is severable, the stay may be granted with respect to that issue only.'") (quoting *Board of Managers of the Courtyards at Woodlands Condominium Ass'n v. IKO Chicago, Inc.*, 183 Ill.2d 66, 74-75, 231 Ill.Dec. 942, 697 N.E.2d 727 (1998)). The Illinois Court of Appeals has explained, further, that "[p]olicies favoring arbitration support a stay of all court proceedings pending arbitration 'where the arbitrable and nonarbitrable issues, although severable, are also interrelated in terms of a complete resolution of the cause between the parties.'" *Id.* (quoting *Kelso-Burnett Co. v. Zeus Development Corp.*, 107 Ill.App.3d 34, 41, 62 Ill.Dec. 789, 437 N.E.2d 26 (1982), and also citing *IKO Chicago*, 183 Ill.2d at 76, 231 Ill.Dec. 942, 697 N.E.2d 727).

This court concludes that, even if the accounting issues—whether certain customers fit the contractual definition of "Harker's Only Customers" and the resulting determination of "Total Intangible Value"—may be severable from legal issues—such as the effect of Schedule 2.2(a)(iii), or the inclusion on that Schedule of customers that did not fit the contractual definition of "Harker's Only Customers," or whether there had been a mutual or unilateral mistake as to whether certain customers met the contractual definition of

"Harker's Only Customers," and what effect, if any, such a mutual or unilateral mistake might have on enforceability or rescission of the Asset Purchase Agreement—the questions are so interrelated in terms of a complete resolution of the cause between the parties that a stay of all court proceedings pending arbitration is appropriate. *See id.* This is so, because the *interplay* between these issues will likely determine whether Reinhart owes Harker's Distribution $2,994,623.00 or Harker's Distribution owes Reinhart $318,191.00, or whether the contract is otherwise subject to rescission.

### III. CONCLUSION

Upon the foregoing, the court concludes that the "accountant remedy" in the parties' Asset Purchase Agreement is "arbitration" within the meaning of governing Illinois law. The court concludes, however, that the arbitration provision requires arbitration of only "accounting" issues—specifically, whether certain customers fit the contractual definition of "Harker's Only Customers" and the resulting determination of "Total Intangible Value." The arbitration provision does not require arbitration of other legal issues—such as the effect of Schedule 2.2(a)(iii) or the inclusion on that Schedule of customers that did not fit the contractual definition of "Harker's Only Customers," whether there had been a mutual or unilateral mistake as to whether certain customers met the contractual definition of "Harker's Only Customers," and what effect, if any, such a mutual or unilateral mistake might have on enforceability or rescission of the Asset Purchase Agreement. Nevertheless, proceedings in this court will be stayed in their entirety, because the arbitrable and non-arbitrable issues are sufficiently interrelated in terms of a complete resolution of the cause between the parties.

THEREFORE, defendant Reinhart's October 28, 2008, Motion To Compel Arbitration And To Stay Proceedings (docket no. 13) is **granted**, as follows:

1. The parties are **ordered to arbitrate**, pursuant to the "accountant remedy" in § 2.2(d) of the Asset Purchase Agreement, whether certain customers fit the contractual definition of "Harker's Only Customers" and the resulting determination of "Total Intangible Value"; and

2. The proceedings in this court, on *all* issues, in their entirety, are **stayed** pending conclusion of arbitration.

**IT IS SO ORDERED.**

**DATED** this 20th day of January, 2009.

MARK W. BENNETT
U. S. DISTRICT COURT JUDGE
NORTHERN DISTRICT OF IOWA